## THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BRADFORD ENERGY CAPITAL, LLC, BRADFORD DRILLING ASSOCIATES XXVII L.P., | § § § § | Case No. 2:17-cv-01231-MRH |
| Plaintiffs, | § § | Hon. Mark R. Hornak Electronically Filed |
| v. | § § | |
| SWEPI LP, Rockdale Marcellus LLC | § § § | |
| Defendants. | § | |

## BRADFORD'S THIRD AMENDED COMPLAINT

Plaintiffs Bradford Energy Capital, LLC ("Bradford Energy") and Bradford Drilling Associates XXVII L.P. ("Bradford Drilling") (collectively "Bradford" or "Plaintiffs") hereby file their Third Amended Complaint ("Complaint") against Defendants SWEPI LP ("SWEPI") and Rockdale Marcellus LLC ("Rockdale").

### I.   PARTIES

1.    SWEPI is a Delaware limited partnership with its principal place of business in Houston, Texas and registered to do business in Pennsylvania with a principal place of business at 190 Thorn Hill Road, Warrendale, Pennsylvania 15086.

    a.    SWEPI has two partners: (1) general partner Shell Energy Holding GP LLC; and (2) limited partner Shell U.S. E&P Investments LLC. Both

partners are organized under the laws of Delaware and have their principal places of business in Houston, Texas.

   b. The sole member of SWEPI's general partner, Shell Energy Holding GP LLC, is SWEPI's limited partner, Shell U.S. E&P Investments LLC. As shown above, both of these entities are citizens of Delaware and Texas.

   c. The sole member of SWEPI's limited partner, Shell U.S. E&P Investments LLC, is Shell Oil Company. Shell Oil Company is incorporated in the State of Delaware and has its principal place of business in Houston, Texas.

   2. Rockdale is a Texas limited liability company organized under the laws of Texas and has its principal place of business in Houston, Texas and is registered to do business in Pennsylvania.

   3. Bradford Energy Capital, LLC is a Delaware limited liability company organized under the laws of Delaware and has its principal place of business in Buffalo, New York and registered to do business in Pennsylvania with a principal place of business at 110 North Second Street, Clearfield, Pennsylvania 16830.

   4. Bradford Drilling Associates is a New York limited partnership organized under the laws of New York and has its principal place of business in Buffalo, New York.

## II.      FACTUAL BACKGROUND

### A.      There was a historic relationship of confidence and trust between Plaintiffs and East, the original Operator and SWEPI's predecessor in  the Operating Agreement

5.       Bradford Energy is the managing general partner of Bradford Drilling.  Bradford Drilling participated in a long-term investment in Marcellus shale wells with East Resources, Inc. ("East").  *See* Declaration and Verification of Daniel C. Mullan ¶ 4 ("Mullan Decl.").  At the time, East held one of the largest positions in the Marcellus with 650,000 contiguous acres.[1]  *Id.*

6.       East and Bradford Drilling drilled nine wells in 2009, with Bradford owning a twenty percent working interest in each of the nine wells. Eight of the wells have been in production since 2010.  *Id* at ¶ 5.

### B.      The Well and the Operating Agreement

7.       On August 31, 2009, Bradford and East executed a Cost Plus Drilling and Operating Agreement ("Operating Agreement") regarding Fitch 115 1H (API Number 37-117-20306) (the "Well"). *See* Exhibit A, attached hereto. As with the other eight wells, Plaintiffs also own a twenty percent working interest in Fitch 115 1H (API Number 37-117-20306) (the "Well"). Mullan Decl. ¶ 5.

---

[1]      *Shell to Buy East Resources for $4.7 Billion*, Oil & Gas Journal, May 28, 2010, http://www.ogj.com/articles/2010/05/shell-to-buy-east.html.  Bradford requests that the court take judicial notice of this publically available information.

8.     East spudded the Well on July 10, 2009, completed it on January 4, 2010, but, never connected the Well to a pipeline and never placed it online.  The Well was part of the East Ultra program.  *Id.* ¶ 12.

9.     Bradford owns a twenty percent working interest in the Well and paid twenty percent of the costs associated with drilling and operating the Well. The Well was expensive at the time, with initial drilling and completion costs of approximately $5 million.  *Id.* ¶ 13.

10.     During the completion process, gas pressure measured at the surface consistently ranged between 3,000 and 4,000 pounds per square inch, indicating a pressurized gas reservoir capable of producing significant quantities of natural gas. *Id.* ¶ 14.

11.     Bradford and East thoughtfully constructed the Operating Agreement based on their special relationship of confidence and trust. *Id.* ¶ 7. Each agreement between Plaintiffs and East used this particular form of Operating Agreement in all of their joint investments, relying on their relationship based on the utmost honesty and good faith. *Id.*

12.     The Operating Agreement appointed East as the operator of the Well. *See* Exhibit A ¶ 3.

13.     The Operating Agreement contains a number of unique and notable features, which makes it different from standard joint operating agreements (*e.g.,* AAPL Form 610 – 1989 Model Form Operating Agreement

("JOA")).  East and Bradford agreed that rather than executing JOAs, Plaintiffs would entrust East to make all elections and decisions provided for in the JOAs on behalf of Plaintiffs.  *See, e.g.,* Exhibit A ¶ 33.   The reason was simple – Bradford is an investment company.  Mullan Decl. ¶ 8.  It has no knowledge or experience in drilling or operating gas wells.  *Id.*  Yet Bradford invested in over 1000 wells with East and relied exclusively on East's decades of experience in drilling and operating gas wells.  *Id.*  East, for example, employed teams of engineers and other professionals with bachelor, masters and doctorate degrees in oil and gas production.  *Id.*  Because of its superior knowledge and position, East took complete control over the operation and production of the oil and gas wells, and kept possession of the data and other information necessary to conduct these operations and maintain production.  *Id.*

14.    Bradford had none of these skills or abilities.  *Id.* ¶ 9. It was not a gas-well operator but knew and relied on East make decisions relating to the exploration and technical aspects (and thereby Bradford's investment money) – that trust and reliance led to a relationship between the parties where Bradford was at East's complete functional control regarding the Well. *Id.*

15.    Although East was in a position to abuse its superior knowledge and power over Bradford and its funds, East took Bradford's investment money and over a fifteen-year period, East acted consistently with its position of confidence and trust.   It made all the well elections, made all the drilling

decisions, kept all the data, and executed all of the rights that a non-operating working interest owner (like Bradford) normally owned under a standard JOA. Each party knew and understood that East had overmastering influence and control over Bradford's ability to make decisions regarding the Well.

16.     East also agreed to put all wells on-line (*i.e.,* connect them to gathering system pipelines) when the wells were "reasonably capable of producing gas." *See, e.g.,* Exhibit A ¶ 4(c) ("Operator agrees to commence or cause the commencement of the drilling of the first Well as soon after the date hereof as possible . . . and if the Well is completed, to put the Well in production as soon as practical."); *Id.* ¶ 5(a) ("Operator also covenants to complete each well that appears, in the Operator's opinion, **reasonably capable of producing oil and gas** in paying quantities and **to produce oil and/or gas** from the Marcellus Shale") (emphasis added); ¶ 9(a) ("Upon successful completion of a Well, Operator and its partners in the AMI shall have exclusive responsibility for operating such Well and agrees to do so in a good and workmanlike manner. . . .). Under this process (*i.e.,* this bargained-for-exchange), Bradford gave up some of its rights as a working interest owner, entrusting East (and thereafter SWEPI, as East's successor in the Operating Agreement) to exercise the rights and provide Bradford with a valuable asset by putting all wells on line that were "reasonably capable" of producing gas in paying quantities. Mullan Decl. ¶ 11.

C.   **Shell bought East, assumed its duties and obligations and became the Operator, until it sold its rights, title and interest to Rockdale.**

17.   On May 10, 2010, British-Dutch oil and gas producer Royal Dutch Shell PLC ("Shell") bought East for $4.7 billion.[2] With this purchase, SWEPI became the operator of the Well, assumed all of East's obligations, and agreed to conduct its operations under the same terms and conditions as East.  *Id.* ¶¶ 10, 15. Moreover, SWEPI, like East, took complete control over the operation and production of the oil and gas wells, and kept possession of the data and other information necessary to conduct these operations and maintain production.  *Id.* Bradford had none of these skills or abilities (nor did it have a long-established relationship with SWEPI), but was forced to rely that SWEPI would act consistently with the prior relationship of trust and confidence.  *Id.*

18.   On October 31, 2017, SWEPI sold and assigned its rights, title and interest in the Well to Rockdale. *See* Doc. No. 26 (Rockdale's Consent Motion to Intervene at pg. 1).

19.   Rockdale is the current owner and operator of the Well. *Id.*

20.   Rockdale has failed to connect the Well to the nearby pipeline and has also failed to place the Well into production.

---

[2]     *Shell buying an Oil and Gas Firm for $4.7 billion*, The New York Times, May 28, 2010, http://www.nytimes.com/2010/05/29/business/global/29shell.html. Bradford requests that the court take judicial notice of this publically available information.

D.      **SWEPI's Pattern of Misrepresentation About the Well**

21.      Shell drilled a number of other wells in proximity to the Well.  In fact, SWEPI operates numerous active well pads within a mile of the Well with various gathering systems, compressor stations, and gas transmission pipelines within reach of the Well.  Mullan Decl. ¶ 16.  SWEPI, however, never placed the Fitch Well in service despite the fact that the other eight wells in the program were placed on-line in a timely fashion. *Id.*

22.      Instead of placing the Well online, SWEPI engaged in a pattern of distortions and misrepresentations regarding the Well.

a.   In a sworn public filing, SWEPI misrepresented to both the public (including Plaintiffs) and a Pennsylvania government agency that there was no existing pipeline to which the Well could be connected.

23.      On September 12, 2012, SWEPI submitted an Application for Inactive Well Status ("Application") to the Commonwealth of Pennsylvania Department of Environmental Protection Oil & Gas Management Program ("DEP") regarding the Well. *See* Exhibit B (copy of Application), attached hereto ("Application"). The Application is a public record - Bradford reviewed it and relied upon the truth of the matters contained therein. *Id.* ¶ 3, 17.

24.      In the Application, DEP (a Pennsylvania government agency) required SWEPI to disclose its "Future Use of the Well," specifically asking SWEPI to "[d]escribe a viable plan, in accordance with 25 PA. Code § 78.102(4),

explaining the intended future use of the well within a reasonable time." *See* Application (Exh. B) at 1. In response, SWEPI affirmatively represented (1) that "***[s]ignificant reserves remain in place***" and (2) that SWEPI "plan[ned] to return the Well to production" as soon the pipeline was "installed." *Id.* ("***Waiting on pipeline***. ***Date of installation*** to be determined.") (emphasis added). SWEPI filed the Application as the "Well Operator" and had it executed by H. James Sewell, its Environmental & Regulatory Team Lead. *Id.*

25.     In truth, a pre-existing pipeline was "installed" in 2011 and was only 50 yards away from the Well. Mullan Decl. ¶ 18. SWEPI affirmatively misrepresented that fact to DEP (and the State of Pennsylvania) as well as to Bradford who relied on SWEPI's public declaration in its sworn Application. *Id.*

26.     Moreover, nowhere in the Application did SWEPI claim that the Well had insufficient reserves or that it would not be economical to attach the Well to a gathering pipeline. SWEPI affirmatively claimed the opposite: (1) that the Well has significant reserves, (2) that SWEPI affirmatively plans to put the Well back in production, and (3) it is only waiting for the installation date of the pipeline. *See* Exhibit B. There was nothing to wait for – the pipeline was already there. SWEPI simply lied or with gross negligence, omitted the truth.

      b.  <u>SWEPI also affirmatively omitted to tell and/or misrepresented the existence of the pipeline to the Plaintiffs.</u>

9

27.     Beginning on June 10, 2014, Plaintiffs asked SWEPI repeatedly as to the status of the Well.  Mullan Decl. ¶ 19.  For example, on June 10, 2014, Mike Hogan (representing Bradford) emailed Thomas O'Reilly (from SWEPI) and asked about the shut-in status of the Well, including SWEPI's claim that the Well "remains shut in due to the lack of a gathering system [*i.e.,* pipeline]."  *See* Exhibit C, attached hereto.  As explained in the email,  Bradford was evaluating the value of the Well and associated assets **in order to sell them to Shell** and had to rely on SWEPI to provide data as to the Well's value and viability (*e.g.,* its ability to profitably produce gas):

> The Fitch 115-1H was drilled in the Bradford BDA 27 program. The well was part of the East Ultra program with Bradford having a 20% WI [Working Interest].  It is my understanding that the well was drilled and completed[;] however it remains shut in due to the lack of a gathering system.  **Bradford does not have any technical data for this well so it is impossible to put a value on it as part of the effort to make an offer to sell the BDA 27 assets to Shell.** Tom, can you provide the drilling, completion and testing record for this asset so we can move forward in the asset evaluation?

*Id.* at 2 (emphasis added); *see also* Mullan Decl. ¶ 20 (Bradford sold its interest in over 600 wells to Shell and had the opportunity to sell other assets, including the Fitch Well, to third parties).

28.     On July 2, 2014, Mr. Rielly (from SWEPI) responded but failed to tell Bradford that SWEPI's prior claims of "lack of a gathering system" were simply not true – the pipeline was 50 yards away.  *Id.* ¶ 21.  Although, SWEPI sent "a CD from the Operations group with data regarding the Fitch 115-1H

well," SWEPI omitted disclosure to Bradford of key information necessary to evaluate the value of the Well and determine potential recovery - that there was a pipeline close by that could easily be connected the Well which had, according to SWEPI's own report, "<u>significant</u> reserves." *See* Application at 1; Mullan Decl. ¶ 21.

29.     These are just two examples of SWEPI's repeated misrepresentations and omissions to Bradford (*e.g.,* that there are no pipelines in the area or that this well is "many miles south of the other wells" that were drilled in this program). *See* Mullan Decl. ¶¶ 19-21.  SWEPI's misrepresentations and omissions were patently false.

> c.  <u>SWEPI continued its misrepresentations and omissions even when confronted by Bradford.</u>

30.     In 2016, Bradford discovered the existence of the pipeline (and SWEPI's misrepresentations) when Mike Hogan, Bradford's representative visited the Well location.  *Id.* ¶ 22.  In a memo dated April 28, 2016, Mr. Hogan reported his findings:

> I performed an inspection of the Shell Appalachia (Shell) operated Fitch #115 well located in Tioga County, Pennsylvania.  The purpose of the inspection was to better understand the reason the well has not been placed in service since it was completed in 2009.  My inspection included a visit to the well site, other nearby wells operated by Shell and pipeline right of ways. . . .  The following are my findings from this inspection tour.

11

**Historical Background**

There were 9 wells, including the Fitch 115, drilled in 2009 by East Resources (predecessor to Shell) with Bradford Drilling Associates 27 LP (BDA 27) owning a 20% working interest in each well.  Eight of the wells have been in production since 2010.  Bradford Energy LLC, as managing general partner for BDA 27, has inquired many times over the last five years as to why the Fitch 115 was not placed into production.  The repeated answer from Shell is there are no pipelines in the area and this well is many miles south of the other wells drilled in the BDA 27 program.

**Findings**

- I started my inspection by visiting the well sites where the other wells in the BDA 27 program were drilled and have been in production for many years.  These particular wells are operated by Talisman Energy USA as part of a joint venture with Shell.  Shell is correct, the Fitch 115 is many miles south east of the other wells in the drilling program (see attached map depicting approximate distance of 18 miles).

- In Shell's discussion with Bradford Exploration they explained that the lack of drilling activity and pipelines was the reason the Fitch 115 was not placed into production.  My inspection proves otherwise.  ***Shell operates numerous active well pads within a mile of the Fitch 115 with various gathering systems [that is, pipelines connected to those wells], compressor stations and gas transmission pipelines [carrying the gas to market] within reach of the Fitch # 115.*** (See attached photos).

- ***Upon inspection of the Fitch 115 well site (see attached photos) it is apparent that a pipeline runs approximately 50 yards from the well site.***  What is unknown is whether this is a high pressure gas transmission line or a lower pressure gas gathering system [that would automatically be] capable of collecting gas from the Fitch 115 well.  If it is indeed a transmission line then ***a pipeline***

> ***from the Fitch well to a lower pressure gathering system***
> [that would automatically be capable of collecting gas] ***could
> be easily built*** with a mile or less of pipeline required as
> ***there are many gathering lines in the area***.

From my inspection it appears that the reasons Shell [*i.e.,* SWEPI]
has given for not placing the Fitch 115 in production are no longer
valid.

*See* Exhibit D ¶¶ 2-6, attached hereto (April 28, 2016 Report from Hogan Energy

Consulting to Michael McGee, representing Bradford) (emphasis added). [3]

31.     On May 3, 2016, shortly after Bradford received Mr. Hogan's

report, Dan Mullan (on behalf of Bradford), sent a letter to Michael Dewitt

(SWEPI's General Manager) expressing concern over SWEPI's apparent

misrepresentations regarding the Well. *See* Exhibit E, attached hereto.  In his

letter, Mr. Mullan reiterated that SWEPI represented to Bradford "time and again

that the well will be put in service eventually when pipelines reach the area where

the Fitch 115 1H [the Well] is located." *Id.*  He then disclosed Mr. Hogan's

findings and once again asked SWEPI to "please inform us when we may expect

the Fitch 115 1H to be placed into production." *Id.*

32.     Jon Sellars, Senior Legal Counsel for Shell, responded on July 12,

2016 and for the first time acknowledged the existence of the pipeline, but then

indicated that SWEPI refuses to connect the Well to the pipeline 50 yards away

---

[3]     Although Mr. Hogan generated this report and provided it to Bradford's lawyer, Bradford does not
waive any attorney-client or any other applicable privileges.  Rather, Bradford provides this report (and its other
cited communications with Mr. Hogan) solely for the facts contained therein.

claiming it would not be economical to do so.  *See* Exhibit F, attached hereto. Through this letter, SWEPI essentially claimed that the cost of building a fifty-yard pipeline was greater than having the Well continuously and economically produce gas for the preceding five years.  Mullan Decl. ¶ 24.

33.   On October 23, 2016, Mr. Hogan conducted further research on behalf of Bradford and discovered that the Well was productive and should have been placed in production, but that SWEPI had misrepresented these facts to Bradford:

> The well was flowed back and had a stabilized gas flow of 2,007,100 standard cu ft. of gas per day (2.071MMCFD). . . . According to Matt Haas and Paul Dudenas this is in line with results from other wells in the area.  Paul suggested that other wells when put online flowed at a rate equal to the stabilized rate attained during flow back.  **This would mean that the Fitch 115 1H was capable of producing over 2,000,000 ft.³ a day (2MMCFD) into the pipeline.**  Historically wells in northwest Pennsylvania with this initial rate of production have a calculated estimated ultimate recovery (EUR) of 3.5 – 6 BCF.
>
> A rule of thumb-based on hundreds of wells drilled in northeast Pennsylvania calls for an estimate of 1.5 BCF of **ultimate recoverable reserves (EUR) per 1000 feet of lateral pay zone, the EUR of the Fitch 115-1H calculates to be 4.38 BCF, far exceeding the unsupported estimate that Shell has furnished as an excuse for not placing the well into production**. . . .
>
> I would conclude that Shell has not given us any reason to believe that this well is anything but a successful Marcellus well and should be placed in production immediately.  If Shell is concerned about cost one must realize that **the only cost to put the well [into] production is the cost of laying a relatively short section of pipeline and tying into the existing gathering system ($100,000 – 200,000).**  All of the other cost to date drilling, and

completion and production equipment is sunk cost so the only cost
to recover to test the well in production would be the incremental
cost of placing the well online.

*See* Exhibit G, attached hereto (October 23, 2016 Report from Hogan Energy

Consulting to Bradford's counsel McGee & Gelman) (emphasis added); Mullan

Decl. ¶ 25.

34.    The estimated cost of connecting the Well to a pipeline is

approximately $100,000 to $200,000, or one tenth of the Plaintiffs' investment

in the Well to date.  *See* Exhibit G; Mullan Decl. ¶ 26.  As will be shown at trial,

based on known natural gas prices during the interval since the Well was drilled

and completed, the value of natural gas production from the Well was at least

$12.5 Million.

| Date | Event | Henry Hub Natural Gas Spot Price |
|---|---|---|
| July 10, 2009 | Well spudded | 3.24 |
| August 31, 2009 | Operating Agreement executed | 2.36 |
| January 4, 2010 | Well completed but never connected to a pipeline or put online | 6.09 |
| May 10, 2010 | East sold to Shell and SWEPI takes over operations of the Well | 4.15 |
| September 12, 2012 | SWEPI submitted Application for Inactive Well Status | 2.94 |
| June 10, 2014 | Bradford repeatedly asked SWEPI about status of the Well | 4.67 |
| July 12, 2016 | Letter from Jon Sellars to Bradford | 2.88 |
| December 4, 2017 |  | 2.91 |

## COUNT ONE – BREACH OF CONTRACT (SWEPI)

35.    Bradford hereby restates and reasserts the allegations set forth in paragraphs above and incorporates them by reference.

36.    As outlined above, Shell violated its obligations under the Operating Agreement by failing to connect the Well to any nearby pipeline and would have cost far less to connect than to give up the production from the significant reserves of gas that the Well contains. *See, e.g.*, Operating Agreement ¶ 5(a); *see also* Application (SWEPI, as Operator, represented to the State of Pennsylvania (1) that "[s]ignificant reserves remain in place and I plan to return the well to production;" and (2) that SWEPI was simply "waiting on pipeline [and the] [d]ate of installation to be determined.").

37.    SWEPI's breaches of the Operating Agreement include, but are not limited to, its breach of its express and implied duty of good faith and fair dealing. Every contract, including the Operating Agreement, imposes upon the parties the duty of good faith and fair dealing in the performance and discharge of obligations arising under their agreement. *See, e.g.,* Operating Agreement § 23 ("the Parties shall be free to act on an arms-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the Parties to act in good faith in their dealings with each other with respect to activities hereunder."). SWEPI thus owed Bradford a duty of good faith and fair dealing, particularly as to the performance of the obligations to drill, complete and

operate the Well pursuant to the Operating Agreement and connect it to the nearby gathering line(s).  As part of that duty, SWEPI should have truthfully and timely communicated the Well's status to Bradford, both upon Bradford's inquiry and in SWEPI's public filings upon which Bradford would reasonably rely.

38.     Moreover, SWEPI put its own wells on-line and favored them over the Well it jointly developed with Plaintiffs.  *See* Exhibit D.  SWEPI acted in bad faith by not giving equal consideration to Bradford's interests as SWEPI gave to its own interest.   SWEPI wrongfully and intentionally breached its duty of good faith and fair dealing by denying the Plaintiffs the benefits they should have received under the contract.

39.     Plaintiffs' rights and obligations under the Operating Agreement are valuable and SWEPI's and Rockdale's delay in placing the Well into production has caused Plaintiffs to lose at least $2.5 million.

40.     Furthermore, Bradford has suffered consequential damages that were proximately caused by SWEPI's breach of the Operating Agreement, including for example, but not limited to Bradford's inability to properly value its asset and thereby lose opportunities to sell its interest in the Well and surrounding assets at market value.  Mullan Decl. ¶ 27.

## VI.    <u>COUNT TWO – BREACH OF CONTRACT (ROCKDALE)</u>

41.    Bradford hereby restates and reasserts the allegations set forth in paragraphs above and incorporates them by reference.

42.    As outlined above, on October 31, 2017, SWEPI sold and assigned its rights, title and interest in the Well to Rockdale, and Rockdale is the current owner and operator of the Well. *See* Doc. No. 26.

43.    Rockdale violated its obligations under the Operating Agreement by failing to connect the Well to any nearby pipeline, and would have cost far less to connect than to give up the production from the significant reserves of gas that the Well contains.  *See, e.g.*, Operating Agreement ¶ 5(a).

44.    Rockdale continued SWEPI's breaches of the Operating Agreement including, but are not limited to, breach of its express and implied duty of good faith and fair dealing, by continuing to fail to connect the Well to the nearby pipeline.

45.    Every contract, including the Operating Agreement, imposes upon the parties the duty of good faith and fair dealing in the performance and discharge of obligations arising under their agreement.  *See, e.g.,* Operating Agreement § 23 ("the Parties shall be free to act on an arms-length basis in accordance with their own respective self-interest, subject, however, to the obligation of the Parties to act in good faith in their dealings with each other with respect to activities hereunder.").  Rockdale thus owed Bradford a duty of good

faith and fair dealing, particularly as to the performance of the obligations to drill, complete and operate the Well pursuant to the Operating Agreement and connect it to the nearby gathering line(s).

46.     Rockford and SWEPI are jointly and severally liable for Plaintiffs' damages.

47.     Plaintiffs' rights and obligations under the Operating Agreement are valuable and SWEPI's and Rockford's delay in placing the Well into production has caused Plaintiffs to lose at least $2.5 million.

48.     Bradford is and will continue to be irreparably harmed by Rockford's failure to connect the Well to the nearby pipeline and place the Well into production.

49.     Accordingly, Bradford requests the Court to enter an order requiring Rockdale to connect the Well to the nearby pipeline and place the Well into production.

## VII.   **PRAYER FOR RELIEF**

50.     Bradford prays for judgment against SWEPI and Rockdale as follows:

- Entry of judgment in favor of Bradford on all claims for relief;

- Direct and consequential damages for the injuries Bradford sustained as a result of SWEPI's and Rockdale's respective breaches of the Operating Agreement;

- Enter an order requiring Rockdale to connect the Well to the nearby pipeline and place the Well into production;

- Bradford's attorneys' fees as well as their costs of Court.  *See* Operating Agreement ¶ 24(c); and

- Any and all other legal and equitable relief as may be available under law the Court may deem proper.

Dated: June 15, 2018                    Respectfully submitted,

BAKER & HOSTETLER LLP

Michael P. Joy
Pa. I.D. Number 207864
mjoy@bakerlaw.com
1801 California Street, Suite 4400
Denver, Colorado 80202-2662
Telephone: 303.861.0600
Facsimile: 303.861.7805

*/s/ Sashe Dimitroff*
Sashe Dimitroff
*Admitted Pro Hac Vice*
Texas Bar Number 00783970
sdimitroff@bakerlaw.com
Rachel Palmer Hooper
*Admitted Pro Hac Vice*
Texas Bar Number 24039102
rhooper@bakerlaw.com
Erika J. Lindberg
*Motion for Admission Pro Hac Vice to be filed*
Texas Bar Number 24090231
811 Main Street, Suite 1100
Houston, Texas 77002-6111
Telephone: 713.751.1600
Facsimile: 713.751.1717

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing document was filed electronically and has been served on all counsel of record via the Court's CM/ECF system.


<i>/s/ Sashe D. Dimitroff</i>

Sashe D. Dimitroff