**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **BRADFORD ENERGY CAPITAL, LLC,** ) | |
| **and BRADFORD DRILLING** ) | |
| **ASSOCIATES XXVII L.P.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil No. 17-1231** |
| ) | |
| **SWEPI LP AND** ) | |
| **ROCKDALE MARCELLUS LLC,** ) | |
| ) | |
| **Defendants.** ) | |

**OPINION**

Plaintiffs Bradford Energy Capital, LLC (Bradford Energy) and Bradford Drilling

Associates XXVII L.P. (Bradford Drilling) (collectively "Bradford") bring suit against

Defendants Rockdale Marcellus LLC (Rockdale) and SWEPI LP (SWEPI) for breach of

contract.  Bradford alleges that Rockdale and its predecessor SWEPI breached a Drilling and

Operating Agreement by failing to place into production a natural gas well in Tioga County,

Pennsylvania.  Pending before the Court are Rockdale's and SWEPI's separate Motions for

Summary Judgment.  ECF Nos. 95 & 98.  The matter is fully briefed, and oral argument was

held on April 16, 2020.  As more fully explained below, Rockdale's Motion will be granted, and

SWEPI's Motion will be dismissed as moot.

## I.     BACKGROUND

Bradford Drilling is a New York limited partnership with its principal place of business

in Buffalo, New York.  Rockdale's Concise Stmt. Mat. Facts ¶ 1, ECF No. 96.  Bradford Energy

is the managing general partner of Bradford Drilling.  Id. ¶ 2.  By virtue of his ownership of

D.C. Mullan and Company, Daniel Mullan is the owner of Bradford Energy.  Id. ¶ 3; Bradford

Resp. Concise Stmt. Mat. Facts ¶ 3, ECF No. 105.  Bradford Energy is the current general

managing partner of Bradford Drilling.  ECF No. 105, ¶ 3.[1]

　　　Defendant SWEPI is a Delaware limited partnership with its principal place of business

in Houston, Texas.  ECF No. 96, ¶ 5.  Defendant Rockdale is a Texas limited liability company

with its principal place of business in Houston, Texas.  Id. ¶ 6.  East Resources, Inc. ("East

Resources"), a nonparty to this action, is a Pennsylvania Corporation with its principal place of

business in Warrendale, Pennsylvania.  Id. ¶ 4.  East Resources engaged in oil and gas

exploration and production, has acted as an oil and gas operator, and owned 650,000 acres in the

geological formation known as the Marcellus Shale Formation.  Id.

　　　Starting in 1994, Bradford began entering into agreements with East Resources in

connection with oil and gas projects, which included drilling oil and gas wells and operation of a

natural gas processing plant. Id. at ¶ 8.  Since 1994, Bradford and its related entities have raised

over $270,000,000 from investors.  Id. at ¶ 11; ECF No. 105, ¶ 11.  Since 1994, Bradford has

also acquired working interests in more than 1,000 oil and natural gas wells, as well as interest in

natural gas processing plants, natural gas pipelines, royalty interests, and mineral rights.  Id

---

[1]  Bradford disputes several of Rockdale's statements of fact regarding specific dates, names, and timing related to the various Bradford entities, and who or what entity acts as a general partner.  None of these disputed facts are material or central to resolving Rockdale's motion for summary judgment.  Bradford does not dispute Rockdale's statements of fact that Bradford and Daniel Mullan are sophisticated business operators in the oil and gas business and have been involved in such business enterprises and agreements since 1994, as evidenced by Bradford Energy Capital's "about us" website page, which states:

> The Bradford group of companies was formed in 1994 to focus on creating investment
> opportunities related to the oil and natural gas industry. Over the ensuing 21 years, Bradford
> Exploration, Inc., Bradford Energy, LLC and Bradford Energy Capital, LLC have been the
> managing general partner of 42 limited partnerships which have invested more than $270 million
> in approximately 2,000 oil and natural gas wells, several natural gas processing plants, natural gas
> pipelines, extensive mineral leases and royalty interests.

http://www.bradfordenergycapital.com/AboutUs.aspx

Bradford Drilling was formed in 2009 as part of a joint venture with East Resources to drill oil and gas wells in Bradford, Lycoming, Sullivan, and Tioga counties in Pennsylvania. ECF No. 105, ¶ 12.  Bradford Energy prepared a private placement memorandum seeking investors to invest in Bradford Drilling, and thereby obtain limited partnerships interests.  ECF No. 96, ¶ 13; "Supplement No. 1 for the Bradford Drilling Associates XXVII, L.P. Confidential Private Placement Memorandum, June 29, 2009 ("Private Placement Memorandum").  Securities firms would bring their clients to invest in Bradford Energy's projects.  ECF No. 105, ¶ 14.  The Private Placement Memorandum was required to be disclosed to potential investors under Commodity and Securities Exchange "Regulation D," codified at 17 C.F.R. ¶¶ 230.500-508. ECF No. 105, ¶ 15.  In its Private Placement Memorandum, Bradford Energy included a section titled, "General Risks of the Oil and Natural Gas Business," which included the following statement:

> **Speculative Nature of Investment.**  Oil and natural gas drilling and production is an inherently speculative activity.  Drilling for natural gas and oil involves a substantial risk of investment loss.  There is always the risk that drilling activity may result in dry holes or wells that do not produce oil or natural gas in sufficient quantities to return the investment made.  There is also substantial risk that the price of oil and natural gas, being volatile, may decrease.  There is the possibility of drilling unproductive wells and the further possibility of drilling wells, though productive, do not produce oil or natural gas in sufficient quantities to return capital invested or a profit thereon.

Private Placement Memorandum, at 9, ECF No. 96-3, at 8 (ECF No. 96, ¶ 15; ECF No. 105, ¶ 15).  It also included a section titled, "Specific Risks of the Partnership," which explained certain risks, in part, as follows:

> **We Have Limited Experience in Drilling to the Marcellus Shale.**  The managing general partner has limited experience in completing wells in the Marcellus Shale. As of December 31, 2008, the managing general partner and affiliated investment partnerships have drilled 5 wells to the Marcellus Shale, 4 of which ha[ve] been completed and are producing, but have been producing for

3

only a short period of time. . . . Also, other operators in the Appalachian Basin
have limited experience in drilling wells to the Marcellus Shale. Thus, we have
much less information with respect to the ultimate recoverable reserves and the
production decline rate in the Marcellus Shale than we have in connection with
other more traditional oil and natural gas wells in the Appalachian Basin.

**Operator Has Limited Experience Drilling Horizontal Wells in Tioga
County, Pennsylvania.** East Resources has drilled and completed only one
horizontal well into the Marcellus Shale in Tioga County, Pennsylvania and
therefore has limited experience and information regarding the Marcellus Shale in
the area where the partnership's wells will be located.
. . .

**Marcellus Wells Are Susceptible to Completion Problems.** Wells drilled to the
Marcellus Shale are susceptible to mechanical problems associated with the
drilling and completion of the wells, such as casing collapse and lost equipment in
the wellbore. In addition, the fracing of the Marcellus Shale will be more
extensive and complicated than fracing wells that do not target shale formations.
Completion problems may add unexpected costs to the wells or cause their total
loss
. . .

**Partnership Will Not Control Wells.** Control of operation of the wells will vest
with East Resources and not with the partnership. The partnership expects that it
will surrender control of well operations to the operators even in cases where it
owns a 50% or more working interest in any of the wells. It is expected that East,
alone or in conjunction with their affiliates, will control all of the wells and,
therefore, will have the power to make decisions which may not be in the
partnership's best interests.

Private Partnership Memorandum, at 5, 7, ECF No. 96-3, at 4, 6 (ECF No. 96, ¶ 16; ECF No.

105, ¶ 16).  Approximately 200 investors acquired limited partnerships in Bradford Drilling,

contributing $20,000,000.  ECF No. 96, ¶ 17; ECF No. 105, ¶ 17.  Bradford Drilling's initial goal

was to raise enough money to obtain a 25% ownership interest in eleven wells, but only raised

enough to obtain a 20% interest in nine wells.  ECF No. 96, ¶¶ 18-19; ECF No. 105, ¶¶ 18-19.

Eight of the nine wells that East Resources planned to drill were located in close

proximity to one another in the northeast corner of Tioga County, in Jackson Township.  ECF

No. 96, ¶ 21.  The ninth well, which is the subject of this litigation, was located in the southeast

corner of Tioga County in Union Township.  ECF No. 96, ¶ 22.  The ninth well is designated as

Drill Site Fitch 115 1H, referred to as the "Fitch Well." Ex. B to Cost Plus Drilling and Operating Agreement, Aug. 31. 2009, ECF No. 96-6, at 9. East Resources characterized the Fitch Well as an "exploration well" in its daily drilling report. ECF No. 96, ¶ 23. The cost to drill and complete the Fitch Well was approximately $5,000,000. ECF No. 105, ¶ 23. Pursuant to its 20% interest in the nine wells, Bradford Drilling invested approximately $1,000,000 into the drilling and completion of the Fitch Well. Id. Bradford Drilling retained Mike Hogan, a petroleum engineer with Hogan Energy Consulting, to review East Resource's plan for the drilling program. ECF No. 96, ¶ 24. Mr. Hogan did not express concerns about any of the wells East Resources planned to drill. Id. at ¶ 52. However, Mr. Hogan explained potential risks. and reminded Bradford to caution potential investors that natural gas drilling is highly speculative activity.   ECF No. 96, ¶ 25; ECF No. 105, ¶ 25.

<u>The Operating Agreement</u>

Once the funds for investing were raised, Bradford Drilling and East Resources entered into a Cost Plus Drilling and Operating Agreement dated August 31, 2009 ("Operating Agreement"). ECF No. 96, ¶ 26. Bradford Drilling and East Resources had previously entered into twenty-six agreements prior to the August 31, 2009 Operating Agreement. ECF No. 105, ¶ 108; ECF No. 111, ¶ 108. East Resources was defined as the "Operator" and Bradford Drilling as the "Non-Operator." ECF No. 96, ¶ 29. The Fitch Well was identified as one of the wells in the drilling program intended to be drilled within the two-year "Primary Term" of the Operating Agreement. ECF No. 96, ¶ 27; ECF No. 105, ¶ 27. The Operating Agreement was not a standard form joint operating agreement used by the American Association of Petroleum Landmen; rather, it was the result of negotiations between Bradford Drilling and East Resources.

5

ECF No. 96, ¶ 28; ECF No. 105, ¶¶ 28, 108; Rockdale's Resp. to Bradford's Add'l Mat. Facts,
ECF No. 111, ¶ 108.

With respect to each well, Bradford Drilling agreed to pay East Resources its 20% pro
rata share of the costs of the well plus an additional 15% of those costs.  ECF No. 96, ¶ 30; Op.
Agr. ¶ 4(a).  Paragraph 5(a) of the Operating Agreement provides in part as follows:

> In consideration of the payments to be made hereunder, and unless otherwise
> agreed to by the Parties, Operator undertakes to drill or cause to be drilled on each
> drill site a Well . . . sufficiently deep to test the Marcellus Shale . . . Operator also
> covenants to complete each well that appears, in the Operator's opinion,
> reasonably capable of producing oil and/or gas in paying quantities and to
> produce oil and/or gas from the Marcellus Shale.

Op. Agr. ¶ 5(a).  Paragraph 8 of the Operating Agreement, entitled "No Guarantee of
Productivity," states: "Nothing in this Agreement shall be construed as a guarantee by Operator
of the commercial productivity of oil and/or gas from any Well drilled pursuant to this
Agreement."  Op. Agr. ¶ 8.

Paragraph 9(a) of the Operating Agreement, entitled "Designation of Operator," provides
the Operator with the exclusive decision–making authority with respect to the operation of all
wells.  Op. Agr. ¶ 9(a).  Paragraph 9(a) also includes an exculpatory clause that limits the
Operator's liability solely to conduct resulting from the Operator's gross negligence or willful
misconduct.  Id.  Paragraph 9(a) states in pertinent part

> Upon successful completion of a Well, Operator and its partners in the AMIs shall
> have the exclusive responsibility for operating such Well and agrees to do so in a
> good and workmanlike manner and in accordance with a degree of care and the
> custom and practice within the industry. . . . Operator shall conduct its activities
> under this Agreement as a reasonably prudent operator, in a good and
> workmanlike manner, with due diligence and dispatch, in accordance with good
> oil and gas field practice, and in compliance with applicable law and regulation,
> but *in no event shall Operator have any liability to Non–Operator for losses
> sustained or liabilities incurred except such as may result from gross negligence
> or willful misconduct*.

6

Id. (emphasis added).  The Operating Agreement's choice of law provision states that it shall be

interpreted in accordance with the laws of Pennsylvania.  Op. Agr. ¶ 29.  Paragraph 9(b), entitled

"Responsibilities of Operator for Drilling and Operating," states, in part, as follows:

> Operator shall perform all of the normal and customary duties of an operator of a
> producing Well, including, but not limited to, the following:
> . . .
>    (ii) insuring that the Well shall remain connected to its gathering line at all
> times (except to the extent that disconnection is necessary for repairs);
> . . .
>    (iv) The following provisions shall apply to each Well drilled hereunder:
>                                                    . . .
>      (C) Operator shall adequately test the Marcellus Shale Formation if Operator
> deems that said Formation may reasonably be expected to be capable of
> producing oil and/or gas in paying quantities as a result of examination of the
> electric log or any other logs or cores or tests conducted hereunder.

Op. Agr. 9(b).  Paragraph 15, entitled, "Compliance with Laws and Agreements," states in part:

"In performing its services Operator shall perform such services in a good and workmanlike

manner with a degree of care and in accordance with the customs and practice in the industry, . .

. ."  Op. Agr. 15.  Finally, Paragraph 23 of the Agreement, entitled "Liability of the Parties,"

states in part:

> In their relations with each other under this Agreement, the Parties shall not be
> considered fiduciaries other than in respect to [certain defined activities], but
> rather the Parties shall be free to act on an arms-length basis in accordance with
> their own respective self-interest, subject, however, to the obligation of the Parties
> to act in good faith in their dealings with each other with respect to activities
> hereunder.

Op. Agr. 23.[2]

---

[2]  Bradford cites Paragraphs 9(b), 15, and 23, as relevant and material provisions of the Operating
Agreement.  ECF No. 105, ¶¶ 109-112.  Rockdale denies that said Paragraphs are relevant or material to
resolving Rockdale's Motion for Summary Judgment.  ECF No. 111, at ¶ 109-112.

7

Drilling the Wells

In 2009, East Resources completed the drilling for the eight wells located in the northeast corner of Tioga County.  ECF No. 96, ¶ 34; ECF No. 105, ¶ 34.  These eight wells were connected to a preexisting pipeline infrastructure gathering system and placed into production in 2010.  ECF No. 96, ¶ 35; ECF No. 105, ¶ 35.  East Resources started drilling the Fitch Well in southeast Tioga County on January 10, 2009.  ECF No. 96, ¶ 36; ECF No. 105, ¶ 36.  The plan for the Fitch Well called for East Resources to (1) drill vertically for almost 6,000 feet, (2) apply a drilling curve at an angle of eight degrees per 100 feet in order to land the wellbore at a depth of 6,500 feet, and (3) drill a 90 degree angle through Lower Marcellus Shale formation to create a 4,300 foot lateral wellbore.  ECF No. 96. ¶ 37.  Even with a drilling plan, reasonable variation from the plan during actual drilling may occur.  ECF No. 105, ¶ 37.  Here, as a result of geological faults, East Resources was not able to drill the Fitch Well's lateral wellbore at a consistent depth through the Lower Marcellus Shale formation.  ECF No. 96, ¶ 38.  Instead of remaining in the Lower Marcellus Shale pursuant to the original plan, the wellbore traveled:

- Upwards into the Upper Marcellus Shale

- Further upwards into the Hamilton Group Shale

- Back downwards into the Lower Marcellus Shale

- Further downwards into the Onondaga limestone formation

- Further downwards into the Needmore limestone formation

- Upwards back into the Lower Marcellus Shale

- Further upwards into the Upper Marcelles Shale

- Further Upwards into the Hamilton Shale Group.

8

ECF No. 96, ¶ 38.[3]  Twenty-nine percent of the wellbore was drilled and completed within the Lower Marcellus Shale, leaving seventy-one percent drilled outside the target formation of the lower Marcellus Shale.  Id. ¶ 39; ECF No. 105, ¶ 39.  The examination of the drill cuttings returned to the surface during drilling, known as a "mud log," indicated that natural gas was not present in certain formations, while other portions did have natural gas indications.  ECF No. 96, ¶ 40; ECF No. 105, ¶ 40.

East Resources commenced hydraulic fracturing operations on the Fitch Well on January 4, 2010.  ECF No. 96, ¶ 41.  Hydraulic fracturing involves the injection of water, sand, and additives at high pressure into the horizontal formation in order to fracture the formation so that the hydrocarbons can flow into the wellbore.  Id. at ¶ 42.  East Resources performed the hydraulic fracturing in eleven separate stages with three "perforation clusters" per stage.  Id. at ¶ 43.  As a result of problems that arose during the hydraulic fracturing process, East Resources did not use as much proppant as expected to keep the fractures open during Stages 1 and 2, but there is no evidence that the completion of the Fitch Well affected potential production.  Id. at ¶ 44; ECF No. 105, ¶ 44.  A number of hydraulic fracturing stages that ended up outside the targeted Lower Marcellus Shale target zone would not contribute to extraction of natural gas, while some of them would have.  ECF No. 96, ¶ 45; ECF No. 105, ¶ 45.  Specifically, nine of the thirty-one perforations made during the hydraulic fracturing process (or 29%) would not have contributed to the production of natural gas.  ECF No. 96, ¶ 46; ECF No. 105, ¶ 46.  After the Fitch Well had been hydraulically fractured, East Resources commenced a flowback pressure

---

[3]  Bradford purports to deny Rockdale's statement of fact describing where the wellbore traveled, but in fact engages in argument about the benefits that would result from putting the Fitch Well online *despite the deviation from the drilling plan*.  ECF No. 105, ¶ 38.

test.  ECF No. 96, ¶ 47.  During the 132-hour flowback test, the casing pressure on the Fitch

Well decreased from approximately 2,950 pounds per square inch gauge (psig) to 330 psig, but

the Fitch Well later recovered pressure.  Id. ¶ 48; ECF No. 105, ¶ 48.  During the flowback test,

the static pressure through the test meter measured only 90 psig, although the pressure did build

back up later.  ECF No. 96, ¶ 49; ECF No. 105, ¶ 49.

SWEPI's Acquisition of East

In May 2010, it was announced that Royal Dutch Shell PLC (referred to as Shell or

SWEPI) had agreed to acquire the business of East Resources.  ECF No. 96, ¶ 51.  As a result,

SWEPI assumed East Resource's contractual obligations under the Operating Agreement.  ECF

No. 105, ¶ 116.  After the transaction was announced, most of East Resource's management

personnel continued to work in their same capacities for a period of time.  ECF No. 96, ¶ 52.

The transaction closed on July 29, 2010.  Id. at ¶ 53.  At that time, SWEPI continued to operate

the assets and contracts under East Resource's name.  Id. at ¶ 53.  East Resources merged with

and into SWEPI in December 2010, at which time SWEPI began operating the assets under its

own name.  Id. at ¶ 54.

Before its sale to SWEPI closed in 2010, East Resources had prepared an application to

obtain a permit from the Pennsylvania Department of Environmental Protection ("DEP") to

construct a gas pipeline system in Tioga County known as the TC–Green–Wet Pipeline Project

(the "TC–Green System").  Id. ¶ 55.  The DEP issued the permit for the TC–Green System in

November 2010.  Id. at ¶ 56.  The permit for the TC–Green System enabled East Resources and

SWEPI to construct pipelines in Tioga County to connect a number of well pads, including the

Fitch Well pad, to an existing gathering system.  Id. at ¶ 57.

10

SWEPI's Review of Information regarding the Fitch Well

SWEPI's corporate representative, Katy Keller, testified that SWEPI was aware that a significant portion of the Fitch Well had been drilled outside of the targeted Lower Marcellus Shale formation.  ECF No. 96, ¶ 58 (citing Deposition of Katy Keller May 10, 2019, at 93 (the "Fitch Well had a lot of out-of-zone geosteering issues"). In reviewing the results of the flowback test of the Fitch Well, Ms. Keller testified that SWEPI considered the low pressure to be evidence of a potential problem with the well.  ECF No. 96, ¶ 59.  Ms. Keller testified that "given the very low pressure by the end of the test, looks like there might be some problem with the well."  Id. ¶ 59; Keller Dep. 72–74.  Ms. Keller further testified that "[g]iven my experience in the field, in general, I'd say most wells after several days would have much higher pressure than – you know, this one is below 500 PSI.  That's very low."  Keller Dep. 73.  Ms. Keller opined that "given my general experience, the pressures are usually twice that high."  Keller Dep. 74.[4]  SWEPI did not develop the Fitch Well and did not put the Fitch Well into production, instead choosing to develop other wells it owned in Tioga County.  ECF No. 96, ¶ 60.  In 2011 and 2012, SWEPI drilled and connected wells located on the Wesneski well pad, the Miller well pad, the Kindon well pad, the Westerbaan well pad, and the Sawyer well pad.  Id. at ¶ 60.

Inactive Well Status

On September 17, 2012, SWEPI submitted an application to the DEP to place the Fitch Well on inactive status.  Id. at ¶61; Application for Inactive Well Status, Sept. 17, 2012 (Inactive Status Application).  Ms. Keller explained that inactive well status means "you have a well that's

---

[4]  Bradford's denials related to Ms. Keller's testimony are not true "denials" of the statements of fact, which are merely reports of Ms. Keller's testimony.  Instead, Bradford engages in argument best included in its brief as Bradford's purported denials do not contradict the accuracy of Rockdale's statements of fact.

capable of production . . . but is not producing for some reason, . . . . and so you file this application to permit the well to remain not producing until such time as it can be brought into production."  Keller Dep. 156.  In the section of the Inactive Status Application entitled, "Future Use of the Well," SWEPI checked the preprinted option stating: "Significant reserves remain in place and I plan to return the well to production."  ECF No. 96, at ¶ 62; Inactive Status Application; Keller Dep. at 157–58.  SWEPI described the Fitch Well's condition as follows: "No corrosion or deterioration.  No bubbling observed around well head or gas readings around cellar."  Inactive Status Application.  SWEPI further advised the DEP that it was waiting to construct a pipeline to connect the Fitch Well to a gathering system.  ECF No. 96, ¶ 63.  If a well is granted "inactive" status, the operator has a five–year period in which it is not obligated to produce oil or gas from the well.  Id. at ¶ 64.  By letter dated June 4, 2013, the DEP approved SWEPI's application to place the Fitch Well on inactive status.  Id. at ¶ 65.  Because the Fitch Well was placed on inactive status, SWEPI was not obligated to plug the well, and it was also not required to take any activities to further develop the well during the five-year period, or until June 4, 2018.  Id. at ¶ 66.

<u>Problems with Wells in Tioga County</u>

The presence of salting and a fault line may decrease production and increase operating costs because the well must be temporarily shut down and the salt cleaned out.  ECF No. 96, ¶ 67. ECF No. 105, ¶ 67.  Many of the wells in Tioga County that SWEPI connected to the TC–Green System experienced problems as a result of the geological faults and salt dome located in the area.  ECF No. 96, ¶ 68; ECF No. 105, ¶ 68.  Specifically, some of the wells on the Sawyer, Neal, and Wesneski pads experienced problems (and increased operating costs) because they were in the vicinity of the salt dome.  ECF No. 96, ¶ 68; ECF No. 105, ¶ 68.  Several of the

wells that were connected to the TC–System and were part of the salt dome have been

unprofitable and have been shut–in.  EDF No. 96, ¶ 69; ECF No. 105, ¶ 69.

As of May 1, 2019, the other eight wells included in the Bradford Drilling-East

Resources Operating Agreement, that were not located in the southeastern corner of Tioga

County, had not produced enough to allow the Bradford drilling program to make money.  ECF

No. 96, ¶ 70; ECF No. 105, ¶ 70.  While Bradford is hopeful that the eight wells in the program

will eventually become profitable, a majority of the wells in the program have not been

profitable as of December 2019.  ECF No. 96, 70; ECF No. 105, ¶ 70.

<u>SWEPI's Post-2011 Communications with Bradford about the Fitch Well</u>

In July 2012, Bradford expressed concern that SWEPI had not yet placed the

Fitch Well into production.  ECF No. 96, ¶ 71.  The Director of Business Advancement for

Bradford, Mark Lillis, stated in an e–mail to SWEPI:

> At your convenience, could you please contact me at my number below so that we
> can discuss the status of the Fitch 115 1 H well in our BDA 27 program? The
> latest update that I have is that no production can be confirmed.  We would like
> further detail as to why there is no production and when we can expect production
> to start.

Email from M. Lillis to T. Reilly, July 16, 2012.  On August 9, 2012, Tim Reilly of

SWEPI responded to Mr. Lillis stating that the Fitch Well had not been placed into

production and was still being evaluated; a pipeline into the area had not been built, nor

had a spur line to the well pad; and that such construction was not on the 2012 or 2013

schedule, as of yet.  Email from T. Reilly to M. Lillis, Aug. 9, 2012.  On April 3. 2014,

on the same email chain, Mr. Lillis asked Mr. Reilly if "the pipeline [had] been built or is

it on the schedule for the near future?"  Email from M. Lillis to T. Reilly, Apr. 3, 2014.

The question of when the Fitch Well would be hooked-up was discussed internally by

SWEPI.  In an April 7, 2014 SWEPI internal email, Charlie Shull explained that the Fitch

Well was not on the schedule for connection to a gathering line in 2014 or 2015 "as of

now," and that SWEPI had considered constructing the line for the Fitch Well in 2013,

but the funding was redirected to wells in the Northwestern region of Tioga County.

Email from C. Shull to B. Hallam, Apr. 14, 2014.

In June 2014, Mike Hogan of Hogan Energy Consulting, acting in his capacity as

Bradford's consultant, asked SWEPI to provide technical data about the Fitch Well so that it

could be evaluated.  ECF No. 96, ¶ 76; Email from M. Hogan to T. Reilly, June 10, 2014.  In an

email exchange with SWEPI in February 2015, Bradford took the position that SWEPI's

decision not to connect the Fitch Well to a gathering system constituted a breach of the

Operating Agreement.  ECF No. 96, ¶ 77; Email from J. Farmelo to T. Reilly, Feb. 27, 2015.

Bradford stated in pertinent part: "One of those wells, the Fitch 115H, has never been put into

production.  We feel that is in conflict with the operating agreement in a number of ways."  Id.

In April 2016, Mr. Hogan visited the Fitch Well, and other SWEPI wells located in Tioga

County.  ECF No. 96, ¶ 78.  As a result of his visit, Mr. Hogan produced a report in which he

concluded that SWEPI could put the Fitch Well into production by connecting it to a gathering

system.  ECF No. 96, ¶ 78; Shell Fitch 115 Report, Apr. 28, 2016.  By letter dated May 3, 2016,

Mr. Mullan reiterated that Bradford considered SWEPI's decision not to connect the Fitch Well

to a gathering system to be a breach of the Operating Agreement.  ECF No. 96, ¶ 79; Letter from

D. Mullan to M. Dewitt, May 3, 2016.  Mr. Mullan stated:

> I am writing on behalf of Bradford Energy Capital, LLC, the Managing General
> Partner of Bradford Drilling Associates 27 (BDA 27), the owner of a 20%
> working interest in the above–captioned [Fitch] well.  This well, along with eight
> others, was drilled by East Resources in 2009. *The eight other wells were all*

14

> *placed online in a timely fashion in 2010.*  However, the Fitch 115 1H has never
> been placed in service. . . .
>
> Representatives of our company have recently visited the Fitch 115 1H location
> and discovered not only that there are pipelines in the immediate area of the Fitch
> 115 1H, but that Shell operates a number of producing multi–well pads within
> approximately 5,000 feet of the Fitch 115 1H.  According to the Operating
> Agreement with East Resources, *each well was to be placed online as soon as*
> *possible after completion.*  This is obviously not the case with the Fitch number
> 115 1H as *the well was completed in January 2010.*

Mullan Letter, May 3, 2016; ECF No. 96, ¶ 80.  On July 12, 2016, SWEPI advised Bradford's

legal counsel that it did not currently anticipate connecting the Fitch Well to a gathering system.

ECF No. 96, ¶ 81; Letter from J. Sellars to M. McGee, July 12, 2016.  SWEPI explained why it

had not connected, and currently had no plan to connect, the Fitch Well to a gathering system:

> An Estimated Ultimate Recovery assessment indicates that this well has ~ 1 BCF
> of associated reserves.  Considering the highly anticipated OPEX [operating
> expenses] due to salting in the area, these calculated reserves are not enough to
> justify the cost of the pipeline as well as the light facilities that will be required to
> move the product to market.
>
> As you know, long–term profitability is essential to achieving business goals; as a
> prudent operator, SWEPI does not view this connection as a financially
> responsible decision for any party at this time.  In the short term, the undertaking
> of this project is uneconomic but as gas prices rise, the tying in of this well will be
> reconsidered in the future.

Sellars Letter, July 12, 2016; ECF No. 96, ¶ 82.  In late September 2016, Mr. Hogan requested

additional information from SWEPI to further evaluate the Fitch Well.  ECF No. 96, ¶ 83; Email

exchange, Sept./Oct. 2016.  SWEPI provided the requested information to Mr. Hogan at the

beginning of October 2016.  Id. ¶ 84.  SWEPI sent the requested information by email, stating:

"As we have mentioned, [SWEPI] has determined that it is not economically feasible to connect

and operate the well at this time.  The calculated reserves are not sufficient to cover the operating

15

expenses (including connecting to the pipeline, light facilities and costs associated with high salting in the area)." <u>Id.</u> ¶ 85.

SWEPI Sells the Assets to Rockdale

In August 2017, SWEPI signed an agreement to convey its oil and gas interests in Bradford, Lycoming, and Tioga Counties, including its 80% working interest in the Fitch Well, to Rockdale. <u>Id.</u> ¶ 86; Purchase and Sale Agreement dated August 23, 2017. When the sale closed in late October 2017, Rockdale became the "Operator" under the Operating Agreement with Bradford Drilling. <u>Id.</u> ¶ 87. In accordance with the Purchase and Sale Agreement, Rockdale assumed all liabilities associated with SWEPI's prior ownership and operation of the assets being conveyed, including SWEPI's obligations to Bradford Drilling under the Operating Agreement. <u>Id.</u> ¶ 88. However, pursuant to the Purchase and Sale Agreement, SWEPI retained certain obligations, including liability "arising directly or indirectly from or incident to the use, occupation, ownership, operation or maintenance of the Assets, or the condition thereof, to the extent that such liability arises from [SWEPI's] ownership or operation of the Assets [including the Fitch Well] prior to the Effective Time [7:00 a.m. January 1. 2017]." Bradford Resp. Stmt. to SWEPI's Stmt.'s of Fact, ¶¶ 22-24, ECF No. 102; Purchase and Sale Agr. 3-4.

Bradford's Claims

Bradford filed a lawsuit against SWEPI in the Court of Common Pleas of Allegheny County, Pennsylvania on June 29, 2017. ECF No. 96, ¶ 89; ECF No. 1-1. After SWEPI removed the lawsuit to federal court, Bradford filed an Amended Complaint. ECF No. 24. Thereafter, Rockdale intervened in this action. ECF No. 26. SWEPI's and Rockdale's Partial Motions to Dismiss the Amended Complaint were granted, and Bradford filed a Second Amended Complaint. ECF No. 52. After the Initial Case Management Conference was held,

16

Bradford was granted leave to file a Third Amended Complaint, which is the operative

Complaint.  ECF No. 67.  In Count I, Bradford alleges that SWEPI breached the Operating

Agreement, in part, by failing to place the Fitch Well into production by connecting it to a

gathering system.  ECF No. 96, ¶ 91; ECF No. 105, ¶ 91; ECF No. 67, at ¶¶ 36–39.  In Count II,

Bradford alleges that after Rockdale acquired the Fitch Well, Rockdale breached the Operating

Agreement by failing to place the Fitch Well into production by connecting it to a gathering

system.  ECF No. 96, ¶ 92; ECF No. at ¶¶ 42–48.  In his deposition as Bradford's corporate

designee, Mr. Mullan clarified that Bradford is *not* asserting that Rockdale should have

connected the Fitch Well to a gathering system after acquiring the well from SWEPI in 2017.

ECF No. 96, ¶ 93; Mullan Dep. at 157–58.  Mr. Mullan testified that the "contention that

Rockdale should have put the well into production is based on the fact that [Rockdale] assumed

all of [SWEPI's] liabilities with respect to this, and [SWEPI] assumed all of East's liabilities,

and, so, therefore, [Rockdale's] liable."  Mullan. Dep. 158.  Bradford thus alleges that (1)

SWEPI breached the Operating Agreement by failing to connect the Fitch Well to a gathering

system, and (2) Rockdale assumed liability for SWEPI's breach under the Purchase and Sale

Agreement.  ECF No. 96, ¶ 94; Mullan Dep. at 158.

As its corporate designee, Mr. Mullan testified that it is Bradford's position in this case

that SWEPI, as the successor to East Resources under the Operating Agreement, never put the

Fitch Well into production by connecting it to a gathering system after East Resources had

drilled and completed the Well.  ECF No. 96, ¶ 95; ECF No. 105, ¶ 95; Mullan Dep. at 61–64,

73–75.  Mr. Mullan explained that, pursuant to the agreement, the Fitch Well should have been

put into production as soon as practical after the gathering system was complete and available.

ECF No. 105, ¶ 95; Mullan Dep. at 61, 64, 74.  According to Mr. Mullan, the Fitch Well should

have been put into production "sometime in 2011."  ECF No. 105, ¶ 95; Mullan Dep. at 64.  Mr.

Mullan further testified that it is Bradford's position that, even if SWEPI believed that the cost of

connecting the Fitch Well to a gathering system would exceed any revenues that it would

generate, the Operating Agreement nevertheless required SWEPI to place the well into

production.[5]  ECF No. 96, ¶ 96; Mullan Dep. at 77–79.  Therefore, Bradford alleges that SWEPI

breached its obligation to connect the Fitch Well to a gathering system in 2011.  ECF No. 96, ¶

97; Mullan Dep. at 64–65, 160.

### Expert Report of Bradford's Expert, W. Clay Kimbrell

In support of its argument that SWEPI breached an obligation to place the Fitch Well into

production, Bradford produced an expert report authored by W. Clay Kimbrell.  ECF No. 96, ¶

98; Kimbrell Expert Report, July 1, 2019 (complete copy attached as Ex. 11 at ECF No. 106-26).

Bradford retained Mr. Kimbrell "to opine on and derive expert conclusions and opinions

concerning the responsibilities, care, and diligence and duties required of a reasonably prudent

operator and determine damages associated with the non-hookup of the [Fitch Well]."  ECF No.

105, ¶98.  Mr. Kimbrell stated in his Report that "SWEPI acted imprudently as an operator under

widely accepted industry practice by failing to hook up the Fitch 115 to sales after completion

even though it had potential to produce significant reserves."  Kimbrell Report, at 13.  Mr.

Kimbrell based his opinion on "widely accepted industry practice," not on legal definitions of the

terms "gross negligence" and "willful misconduct."  ECF N0. 105, ¶ 151; ECF No. 111, at ¶ 151.

---

[5]  Bradford denies Rockford's statement of fact as a mischaracterization of the testimony, but Bradford only cites to
a small portion of the deposition testimony cited by Rockdale; that is, that Mr. Mullan thought it would be "a highly
unusual situation" for an operator to complete a well and then not believe it would be economic to put it into
production, and if it did happen, Mr. Mullan "would expect the operator to come to me and explain what's going
on." ECF NO. 105, ¶ 96.  A full reading of the deposition testimony cited by Rockdale demonstrates that Rockdale's
statement of fact is accurate.

18

In support of his opinion, Mr. Kimbrell states that: SWEPI purportedly conceded that "significant reserves" could be extracted from the Fitch Well and SWEPI connected other wells in the area to gathering systems (in which it owned a 100% interest, as opposed to the 80% interest) in 2011. Kimbrell Report at 13.  Mr. Kimbrell opined:

> The decision not to hook up the Fitch 115 was presumably either a complete, inexcusable oversight, or was intentional. If a complete oversight, then SWEPI showed an extreme departure from ordinary care or want of even scant care. If intentional, SWEPI must have desired to bring about the outcome that followed — that is, the lost opportunity to produce gas from the well, or at least been substantially certain that outcome would ensue.

Kimbrell Report at 13.  Mr. Kimbrell does not identify any data available to SWEPI in 2011 regarding the volume of gas that the Fitch Well could be expected to produce, the  prices that purchasers could be expected to pay for the gas, or the costs of connecting the Fitch Well to a gathering system.  ECF No. 96, ¶ 102.  Rockdale's expert, Michael Krebel, however, opined that based on the information available to SWEPI in 2011, a reasonable prudent operator "could not have definitively said [the Fitch Well would be] unprofitable."  ECF No. 105, ¶ 102; Deposition of M. Krebel, Oct. 16, 2019, at 78.  Mr. Kimbrell testified that he did not know, and made no effort to determine and assess, the information that SWEPI considered in 2011 when it elected not to incur the costs of connecting the Fitch Well to a gathering system.  Kimbrell Dep. at 97. Mr. Kimbrell testified as follows:

> Q. So it's your opinion that the breach occurred no later than January of 2012, correct?
>
> A. That's correct.
>
> Q. Okay. What data did SWEPI have in January of 2012 that evidenced that the well was capable of producing in paying quantities?
>
> A. I have no idea what they had.

Kimbrell Dep. at 96–97.  During his deposition, Mr. Kimbrell also advanced Bradford's position, as stated by Mr. Mullan, that the fact that SWEPI's predecessor had drilled and completed the Fitch Well, in and of itself, required SWEPI to subsequently incur the costs of connecting the well to a gathering system.  Kimbrell Dep. 98.  Mr. Kimbrell relies upon the opinion of a separate expert, James Harden, that the cost to connect the Fitch Well to a gathering system in 2011 would have been $554,000.  Kimbrell Report at 13.  He then opines that, according to models that Mr. Kimbrell prepared, SWEPI would have recovered the hookup cost in approximately one month of production.  Kimbrell Report at 13.  Mr. Kimbrell prepared financial models to calculate the damages that Bradford seeks to recover in this lawsuit. Kimbrell Dep. at 139–140. Mr. Kimbrell admitted that his financial models are based upon data from wells Rockdale drilled in 2018.  Id.  Specifically, he admitted that he based his model on data regarding the Wesneski 2H well and the Neal 375 2H well.  Id.  Because these wells were drilled in 2018, SWEPI did not have such data from these wells in 2011, when it decided not to place the Fitch Well into production.  ECF No. 96, ¶ 106.  Bradford alleges that had the Fitch Well been put into production, Bradford would have made $8,000,000 in profits, and SWEPI's would have made $30,000,000 in profits.  Kimbrell Dep. at 173–76.

## II.    STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed R. Civ. P. 56(a).  The court must enter summary judgment against a party who fails to make a showing sufficient to establish an element essential to his or her case, and on which he or she will bear the burden of proof at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In evaluating the evidence, the court must interpret the facts

in the light most favorable to the nonmoving party, drawing all reasonable inferences in his or her favor.  Watson v. Abington Twp., 578 F.3d 144, 147 (3d Cir. 2007).

In ruling on a motion for summary judgment, the court's function is not to weigh the evidence, make credibility determinations, or determine the truth of the matter; rather, its function is to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000) (citing decisions); Anderson v. Liberty Lobby, 477 U.S. 242, 248–49 (1986); Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n. 3 (3d Cir. 1998). The mere existence of a factual dispute, however, will not necessarily defeat a motion for summary judgment.  Only a dispute over a material fact—that is, a fact that would affect the outcome of the suit under the governing substantive law—will preclude the entry of summary judgment.  Liberty Lobby, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable trier of fact could render a finding in favor of the nonmoving party. McGreevy v. Stroup, 413 F.3d 359, 363 (3d Cir. 2005).

Where the nonmoving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the nonmoving party's burden of proof or that there is an absence of evidence to support the nonmoving party's case. Celotex Corp., 477 U.S. at 322, 325; Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007).  If the movant meets his or her burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial" and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide.  Fed. R. Civ. P. 56(e); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex, 477 U.S. at 323-25.  The nonmoving party must go

21

beyond his or her pleadings and designate specific facts using affidavits, depositions, admissions or answers to interrogatories showing that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 324. The nonmoving party cannot defeat a well-supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. Williams v. Borough of West Chester, 891 F.2d 458, 260 (3d Cir. 1989). Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)). Inferences based upon speculation or conjecture do not create a material factual dispute sufficient to defeat a motion for summary judgment. Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

## III.   DISCUSSION

Rockdale argues that Bradford's breach of contract claim is barred by Pennsylvania's four-year statute of limitations.  Alternatively, Rockdale argues that Bradford is precluded from recovering damages unless SWEPI's decision not to put the Fitch Well into production in 2011 constitutes willful misconduct or gross negligence in violation of the Operating Agreement's exculpatory clause.  Bradford's arguments apply equally to the claim against SWEPI, however, SWEPI separately seeks summary judgment based on the theory that its liability has been extinguished as a matter of law due to Rockdale's assumption of liability under the Purchase and Sale Agreement.  The Court addresses Defendants' arguments in turn.

**A.  Statute of Limitations**

The parties agree that Pennsylvania's four-year statute of limitations for breach of contract claims applies in this case.  42 Pa. Cons. State. § 5525(a).  "Generally, a statute of limitations period begins to run when a cause of action accrues; *i.e.*, when an injury is inflicted and the corresponding right to institute a suit for damages arises."  Gleason v. Borough of Moosic, 15 A.3d 479, 484 (Pa. 2011).  "As a general rule, it is the duty of the party asserting a cause of action to use all reasonable diligence to properly inform himself of the facts and circumstances upon which the right of recovery is based and to initiate suit within the prescribed period."  Crouse v. Cyclops Industries, 745 A.2d 606, 611 (Pa. 2000).  As to what is meant by reasonable diligence, the Pennsylvania Supreme Court "has long held that there are few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful."  Crouse, 745 A.2d at 611.  "When properly invoked, however, the 'discovery rule' acts 'as an exception to this principle, and provides that where the complaining party is reasonably unaware that his or her injury has been caused by another party's conduct, the discovery rule suspends, or tolls, the running of the statute of limitations.'"  Brawner v. Educ. Mgmt. Corp., 513 F. App'x 148, 150 (3d Cir. 2013) (quoting Gleason, 15 A.2d at 484).  "'Where . . . reasonable minds would not differ in finding that a party knew or should have known on the exercise of reasonable diligence of his injury and its cause, the court determines that the discovery rule does not apply as a matter of law.'"  Brawner, 513 F. App'x at 150 (quoting Fine v. Checcio, 870 A.2d 850, 858–59 (Pa. 2005) (other citations omitted).

Rockdale contends that there is no genuine dispute of material fact that Bradford's breach of contract claim accrued no later than January 1, 2012.  Therefore, Bradford argues that this

23

action filed on June 29, 2017, is barred by Pennsylvania's four-year statute of limitations.  In

response, Bradford argues that its claim did not accrue until SWEPI formally told Bradford by

letter dated July 12, 2016, that SWEPI had no plan to put the Fitch Well into production "at this

time."  Alternatively, Bradford argues that the question of when Bradford was reasonably aware

that it suffered an injury is an issue to be determined by a factfinder.

       In its Third Amended Complaint, Bradford alleges that SWEPI and Rockdale violated

paragraph 5(a) of the Operating Agreement by failing to connect the Fitch Well to any nearby

pipeline.  Third Am. Comp. ¶¶ 16, 36, 43.  Paragraph 5(a) requires the Operator "to complete

each well that appears, in the Operator's opinion, reasonably capable of producing oil and/or gas

in paying quantities and to produce oil and/or gas from the Marcellus Shale."  Op. Agr ¶ 5(a).  In

Bradford's Responsive Statement of Material Facts, Bradford admits that SWEPI's breach

occurred in 2011.  ECF No. 105, ¶ 97 (admitting that "Bradford alleges that SWEPI breached its

obligation to connect the Fitch Well to a gathering system in 2011").

       Bradford's admission is supported by the deposition testimony of Bradford's corporate

representative, Mr. Mullan, who testified as follows:

> Q. the factual basis of[the] breach is that the Fitch Well was never put into
> production?
> A. Correct.
> Q. What's the basis for that position?
> A. There's no logical reason to complete a well unless you intend to put it into
> production.  It's obvious that East intended to complete the well.  Shell never put
> it into production.  The agreement says it has got to be put into production as soon
> as practical.

Mullan Dep. 61.  Mr. Mullan further explained the factual basis of the breach:

> [Mr. Mullan]: The decision to complete a well is made after reviewing whatever
> information you have available to you at the time you begin your completion
> process and you look at the cost of that, what's that going to cost to complete.
> And then you look on the other hand what -- whether it makes -- whether at that

juncture it makes sense to spend the money to complete the well.  And there's no logical reason to decide to spend the completion money, unless you intend to put the well into production.

Mullan Dep. 61-62.  It follows from Mr. Mullan's explanation that Bradford's position is, once an Operator completes a well, the well must be put into production or else the Operator has breached the agreement.  Mr. Mullan verifies this conclusion in his testimony:

> Q .. . .  You said there was no logical reason to complete the well unless you intended to put it into production, that East had completed the well, but Shell had not put it into production, and that the agreement says that a well should be put into production as soon as practical?
> A.  Correct.
>
>   . . .
>
> A. When should the well have been put into production?
> . .   .
> A. . . .  As soon as the gathering system was complete and as soon as it was available.
> Q. When was the gathering system available?
> A. As far as we can tell, it was completed sometime in 2011.

Mullan Dep. 63-64.

Bradford's expert, Craig Kimbrell, corroborated Mr. Mulan's testimony, both as to when a well is required to be put into production and as to when the breach in this case occurred.  As to when the breach occurred, Mr. Kimbrell testified as follows:

> Q .. So it's your opinion that the . . . breach occurred no later than January 2012, correct?
> A.  That's correct.

Kimbrell Dep. 96-97.  Mr. Kimbrell was then asked, "what data [SWEPI] had that makes you think that [SWEPI] should have known that as of [January 1, 2012], that the "well should be put into production."  Kimbrell Dep. 97-98.  He replied, "The well had been completed to be produced."  Kimbrell Dep. 98.  The following clarifying exchange then occurred:

Q. So the well being completed is the data that indicates that the well is capable of
producing in paying quantities [as required by Paragraph 5(a)]?
A. That's correct, because it would not have been completed otherwise.

Kimbrell Dep. 98.

Mr. Kimbrell's and Mr. Mullan's testimony are consistent and clear: the decision
of an Operator to complete a well is *de facto* evidence that the well is capable of
producing in paying quantities. Therefore, not putting a completed well into production
pursuant to the terms of the Operating Agreement is a breach. The evidence
unequivocally establishes that Bradford alleges that the Fitch Well should have been put
into production as soon as it was completed sometime in 2011. Therefore, the breach of
contract claim - the failure of SWEPI to put the Well into production - occurred and
accrued no later than January 1, 2012. Franconia Assocs. v. United States, 536 U.S. 129,
142–43 (2002) (failure to perform by time performance is due establishes an immediate
breach) (citation omitted). Bradford was factually aware that the breach occurred, and it
was being injured as a result, no later than July 16, 2012. On that date, Bradford asked
SWEPI why there was no production from the Fitch Well and when such production
would start. Email from M. Lillis to T. Reilly, July 16, 2012.

Bradford's argument that the breach itself did not occur until SWEPI's July 12,
2016 letter is inconsistent with the Operating Agreement's requirement that a completed
well must be put into production. An Operator who takes months, or years, to decide
whether to put a completed well into production has nonetheless breached the Operating
Agreement when it did not put the Well into production. The July 12, 2016 date is also
inconsistent with Mr. Mullan's and Mr. Kimbrell's testimony that the Fitch Well was
completed in 2011, but was not put into production by January 1, 2012, when the breach

26

occurred.  Finally, the July 12, 2016 date is inconsistent with Bradford's July 16, 2012 email, in which Bradford indicated its awareness that the Fitch Well had not been put into production.[6]  Moreover, Bradford seeks damages dating from January 1, 2012, the date the breach occurred.  If the breach occurred in July 2016, Bradford would not be entitled to recover damages from 2012, four years before the breach occurred.  The fact that Bradford seeks damages as of January 1, 2012, supports Bradford's position that the breach occurred at that time.  Therefore, the record evidence demonstrates that the breach occurred and accrued no later than July 1, 2012, and the statute of limitations period began to run no later than July 16, 2012, unless Bradford can show that an exception applies.

Bradford argues that there is a genuine issue of material fact as to when Bradford was reasonably aware that it was injured as a result of SWEPI's failure to put the Fitch Well into production.  In support of this argument, Bradford relies on SWEPI's communications that consistently indicated to Bradford, in one form or another that, although the Fitch Well had not been put into production, SWEPI continued to leave open the possibility that the Well would be put into production at some later date.[7]

---

[6]  In addition, Bradford representatives had indicated to SWEPI prior to July 2016, that Bradford believed SWEPI had breached the agreement because SWEPI had not put the Fitch Well into production.  Since Bradford knew that it had been harmed earlier than July 12, 2016, Bradford was not required to wait until July 2016 to institute suit.  Finally, the July 2016 communication, like nearly every other SWEPI communication to Bradford, left open the possibility that SWEPI would put the Fitch Well into production at some uncertain time in the future.  Thus, the July 12, 2016 communication is not factually significant for determining the accrual date of the breach.

[7]  Bradford's alleged reliance on SWEPI's misrepresentations and withholding of information is not relevant to this lawsuit, as such allegations do not affect Bradford's knowledge of the breach or its injury.  Moreover, Bradford chose not to file suit while it engaged with SWEPI about the Fitch Well.  Had SWEPI responded to any of Bradford's inquiries and put the Fitch Well into production sometime after January 1, 2012, perhaps Bradford would not have filed suit, but it certainly could have.  Bradford would

Bradford's communications with SWEPI are evidence of Bradford's diligent pursuit to persuade SWEPI to put the Fitch Well into production; a Well that the experts assert should have been put into production as soon as it was complete in 2011.  Similarly, Bradford knew it was harmed by the failure to put the Well into production, as a non-producing well deprived Bradford of potential proceeds from recovered gas or oil. Bradford knew of both the breach and injury no later than its July 16, 2012 email to SWEPI.  Therefore, Bradford's assertion that it did not know it was harmed by SWEPI's breach until July 2016 is not supported by the record evidence.[8]  While Bradford was entitled to persuade SWEPI to comply with the Operating Agreement before it filed a lawsuit, it is not relieved of its duty to file suit within the limitations period.

Furthermore, Bradford's awareness that the Fitch Well was completed, but not put into production, is a sufficient reason to "awaken inquiry and direct diligence in the channel in which it would be successful." Crouse, 745 A.2d at 611.  In fact, Bradford did direct diligence in the proper direction by engaging in a concerted effort aimed at demanding that SWEPI put the Fitch Well into production, that SWEPI purchase Bradford's interest in the Well, or that SWEPI provide Bradford with information so it could market its investment to someone else.  Bradford did not, however, file suit within

---

have been entitled to file suit for breach of contract to seek damages from January 1, 2012 to the date SWEPI eventually put the Well into production.

[8]  Nor did SWEPI deceive, mislead, or prevent Bradford from discovering that the Fitch Well was not put into production in January 2012 "Generally, 'equitable tolling may be appropriate: (1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum.'" Weis-Buy Servs., Inc. v. Paglia, 411 F.3d 415, 424 (3d Cir. 2005) (quoting Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir.1994)).

the four-year limitations period.[9]  Therefore, the Court finds that "reasonable minds would not differ in finding that [Bradford] knew or should have known" that it was injured by SWEPI's failure to put the Well into production no later than July 16, 2012. Brawner, 513 F. App'x at 150.  Accordingly, Rockdale's' Motion for Summary Judgment based on Bradford's failure to timely file suit will be granted and Bradford's claims will be dismissed.

### B.  The Operating Agreement's Exculpatory Clause

Rockdale also argues that it cannot be held liable as a matter of law under the Operating Agreement's exculpatory clause in paragraph 9(a), which states, "in no event shall Operator have any liability to Non–Operator for losses sustained or liabilities incurred except such as may result from gross negligence or willful misconduct."  Op. Agr. ¶ 9(a).  "[E]xculpatory clauses in a contract are utilized to exempt one party from future liability for negligence."  IP Petroleum Co. v. Wevanco Energy, L.L.C., 116 S.W.3d 888, 895 (Tex. App. 2003).  Therefore, it is not enough for Bradford to show that SWEPI breached a term of the Operating Agreement or that SWEPI acted negligently.  Bradford must prove that SWEPI's decision not to place the Fitch Well into production constituted gross negligence or willful misconduct.

---

[9]  A similar conclusion was reached in Yoder v Frontier Nursing University, Inc., in which an expelled nursing student brought suit against her former nursing school.  351 F. Supp. 3d 934 (W.D. Pa. 2018).  Yoder was wronged on an ascertainable date and sought to have the wrong corrected by communicating with the opposing party.  The nursing school eventually told Yoder that the initial wrong act would not be changed.  The limitations period had passed before Yoder filed suit, so she argued that she did not discover her injury until the nursing school's final communication.  The Yoder Court found the discovery rule to be inapplicable as Yoder knew of her injury when the school expelled her and her "attempt[s] to fix the problem by appealing her punishment and seeking readmission" did not affect when she first knew of her injury.  Id. at 941.  Similarly, Bradford knew it was injured by SWEPI's failure to put the Fitch Well into production as required by the Operating Agreement no later July 16, 2012.  Like in Yoder, Bradford's attempts to engage in discussions with SWEPI about the status of the Fitch Well do not affect when Bradford first knew it was injured.

The Pennsylvania Supreme Court defines "gross negligence" as "'a form of negligence where the facts support substantially more than ordinary carelessness, inadvertence, laxity, or indifference.'" Albright v. Abington Mem'l Hosp., 696 A.2d 1159, 1164 (Pa. 1997) (quoting Bloom v. DuBois Regional Medical Center, 597 A.2d 671, 679 (Pa. Super. Ct. 1991)). "'The behavior of the defendant must be flagrant, grossly deviating from the ordinary standard of care.'" Albright, 696 A.2d at 1164 (quoting Bloom, 597 A.2d at 679). The "determination of whether an act or failure to act constitutes gross negligence is for a jury, but may be removed from consideration by a jury and decided as a matter of law only where the case is entirely free from doubt and there is no possibility that a reasonable jury could find gross negligence." Albright, 696 A.2d at 1165.

The Pennsylvania Supreme Court defines "willful misconduct" as conduct whereby "the actor desired to bring about the result that followed, or at least that he was aware that it was substantially certain to ensue." Evans v. Philadelphia Transp. Co., 212 A.2d 440, 443 (1965); see also Renk v. City of Pittsburgh, 641 A.2d 289, 293 (1994). "[W]illful misconduct is a demanding level of fault." Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006). "Like gross negligence, willful misconduct is typically a jury question, unless the record could not possibly support such a finding as a matter of law. Paramount Fin. Commc'ns, Inc. v. Broadridge Inv'r Commc'n Sols., Inc., No. CV 15-405, 2019WL 3022346, at *12 (E.D. Pa. May 23, 2019).

*The Circumstances of the Breach in this Case*

Under the above-cited Pennsylvania law, a simple breach of a contract, by itself, is insufficient to establish gross negligence or willful misconduct, otherwise every breach of a contract would qualify. Therefore, the failure to put the Fitch Well into production in violation of the Operating Agreement, an ordinary breach, is not viewed in isolation. The breaching

conduct must be considered in connection with the resulting injury to Bradford.  There are several possible outcomes that may arise from SWEPI's decision not to put the Fitch Well into production.  First, the Well may not have produced at all.  Such an outcome does not injure Bradford.  Second, the Well may have produced enough to recover some of the costs of drilling the Well, but not enough to make a profit.  Bradford is injured in this case, as the Well would have "produced in paying quantities" within the terms of the Operating Agreement.  Similarly, the Well may have produced, but in such minimal amounts that putting the Well into production is not economically justified.  Bradford is also injured in this scenario, as Bradford would prefer to recover some of its costs, even if minimal, rather than none.  Both such injuries, however, are the result of an ordinary breach of the Operating Agreement, causing an ordinary, expected harm.  If SWEPI viewed the available data and made a judgment call to not put the Fitch Well into production, even though the Well would have had some production, the breach is exactly the kind of conduct that is encompassed within the exculpatory clause.  Finally, the Fitch Well may have had superior production, such that the failure to put the Well into production deprived both SWEPI and Bradford of substantial profits.  IP Petroleum Company, 116 S.W.3d at 897 ("harm anticipated must be extraordinary harm, not the type of harm ordinarily associated with breaches of contract or even with bad faith denials of contract rights").  Under this scenario, SWEPI's conduct is not protected by the exculpatory clause if such conduct constitutes gross negligence or willful misconduct.

*Relevant Evidence*

The parties disagree as to the evidence the Court should consider.  Rockdale contends that SWEPI's conduct be evaluated based solely on evidence available prior to the date of the breach, which as discussed above, is no later than January 1, 2012.  Consideration of the

defendant's conduct requires "'an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight.' Reeder v. Wood Cty. Energy, LLC, 395 S.W.3d 789, 796 (Tex. 2012), *opinion supplemented on reh'g* (Mar. 29, 2013) (citation omitted); see also IP Petroleum Company, 116 S.W.3d at 897 ("magnitude of the risk is judged from the viewpoint of the defendant at the time the events occurred").  The Court has determined that the breach in this case occurred no later than January 1, 2012.  Therefore, the Court will examine SWEPI's conduct based on evidence available prior to January 1, 2012.

Bradford argues that the Court should consider SWEPI's and Rockdale's conduct through 2018, the entire time period they owned the Fitch Well.[10]  However, there is only a single breach of contract alleged.  The only damages sought are lost proceeds from the failure to put the Fitch Well into production by January 1, 2012, which damages have continued through the present.  Therefore, the only evidence relevant to determining whether the exculpatory clause protects Defendants from liability is evidence available prior to January 1, 2012.

---

[10]  Bradford's argument that the relevant conduct should be expanded to 2018 is premised on the erroneous assertion that Rockdale knew, prior to 2012, that the Fitch Well would not have been viable or profitable, and SWEPI knew it would not connect the Well to a gathering system.  Bradford Br. Opp. 5, 11, 12-14, 15, 18.  From that incorrect premise, Bradford argues that questions of fact exist as to whether SWEPI's and Rockdale's post-2011 misleading and false communications constitute gross negligence or willful misconduct.  Specifically, Bradford argues that Defendants' communications through 2018 establish a question of fact as to whether SWEPI willfully misrepresented and intentionally withheld SWEPI's knowledge about the viability of the Fitch Well and its future plans for the Well.  Bradford Br. Opp. 15, 16.  The Court has reviewed the pleadings and Rockdale does not assert that the Fitch Well was incapable of producing gas; Rockdale does not assert that SWEPI knew in 2012 that the Fitch Well would never have been viable or profitable; and Rockdale does not assert that SWEPI knew, prior to 2012, that the Well would not be put into production.

32

*Rockdale's Argument*

Rockdale argues that SWEPI believed, based on the available data and is own experience, that the Fitch Well had problems affecting the economics of putting the Well into production. Rockdale acknowledges that SWEPI continued to consider the economic viability of putting the Fitch Well into production after 2012, as shown in its communications to Bradford and the DEP, but SWEPI did not change its decision, and did not put the Well into production.  Rockdale argues that such business judgment is appropriate because its decision not to put the Fitch Well into production does not constitute gross negligence or willful misconduct.

The evidence Rockdale points to in support of its argument are the following undisputed statements of fact.  Drilling of the Fitch Well deviated from the original plan.  The Fitch Well was not able to be drilled laterally at a consistent depth through the Lower Marcellus Shale formation.  The Fitch Well wellbore traveled outside the originally targeted Lower Marcellus Shale.  Twenty-nine percent of the wellbore was drilled and completed within the Lower Marcellus Shale, leaving seventy-one percent drilled outside the target formation of the lower Marcellus Shale.  The mud log indicated that natural gas was not present in certain formations, although other portions did have natural gas indications.  A number of hydraulic fracturing stages that ended up outside the targeted Lower Marcellus Shale target zone would not contribute to extraction of natural gas, although some of them would have.  Nine of the thirty-one perforations made during the hydraulic fracturing process (or 29%) would not have contributed to the production of natural gas.  Problems arose during the hydraulic fracturing process, and as a result not as much proppant as expected was used to keep the fractures open during Stages 1 and 2.  During the flowback test, the casing pressure on the Fitch Well decreased.

Rockdale argues that SWEPI's review of the pre-2012 existing evidence resulted in the following opinions.  SWEPI believed that because a portion of the Fitch Well had been drilled outside of the targeted Lower Marcellus Shale formation, it would negatively affect production, because at that time it was generally agreed that the Lower Marcellus Shale formation would be more promising than other areas.  SWEPI considered the low-pressure results of the flowback test to be evidence of a potential problem with the well.  SWEPI believed that in its experience most wells would have had much higher pressure after several days, usually twice as high as the low-pressure result of the Fitch Well.  SWEPI had developed other wells it owned in Tioga County, and some of the drilled wells experienced problems because the wells were in the vicinity of the salt dome, which increased operating costs.  SWEPI was concerned that the presence of salting and a fault line may negatively affect production and increase operating costs of the Fitch Well.  In fact, several of the wells that were part of the salt dome had been unprofitable and were eventually "shut-in."  SWEPI also knew that it had never put a well into production with characteristics similar to the Fitch Well.

*Bradford's Arguments in Opposition*

Bradford can avoid summary judgment if it can show there is a question of fact whether the available data showed that putting the Fitch Well into production would result in substantial profits to both SWEPI and Bradford.  Accordingly, SWEPI's conduct may constitute gross negligence if SWEPI did not review the available data showing the superior potential of the Fitch Well, SWEPI deviated from ordinary care in reviewing the data, or SWEPI flagrantly disregarded the data.  Albright, 696 A.2d at 1164.  Likewise, SWEPI may have engaged in willful misconduct if SWEPI intentionally chose to deprive Bradford of substantial profits from a

producing Fitch Well, knowing or believing, based on the available data, that such deprivation was certain to occur.  Evans, 212 A.2d at 443.

Bradford argues that a post-hoc evaluation of the evidence available to SWEPI indicates that the Fitch Well would have been productive, and that increased costs would have been negligible.[11]  Prior to January 1, 2012, SWEPI of course did not have post-2011 data available for consideration.  Thus, the bulk of Bradford's argument only supports the conclusion that reasonable operators could disagree about whether the Fitch Well should have been put into production.  A *reasonable* disagreement about a decision cannot render that decision grossly negligent or the result of willful misconduct.  Albright, 696 A.2d at 1164 (Defendant's behavior must be "flagrant", not reasonable).  Bradford also argues that its expert's report and opinion are enough to create a genuine issue of material fact.  Bradford's expert's opinion that SWEPI's conduct was grossly negligent and the result of willful misconduct is primarily based on evaluation of post-2012 evidence to conclude that SWEPI should have known in 2012 that the Fitch Well would have been highly productive.  In addition, Mr. Kimbrell testified that he did not know what evidence SWEPI had available to it prior to January 1, 2012, because he (and Bradford) had already determined that the fact that the Fitch Well was completed is all the evidence needed to show that the Well should have been put into production.  In addition, the arguments made by Mr. Kimbrell show that reasonable operators could disagree about what the data meant.  Finally, Bradford's argument that an issue of fact arises from SWEPI's conduct in favoring its 100%-owned wells over its 80%-owned Fitch Well does not address SWEPI's

---

[11]  The Court is not addressing Bradford's arguments to the extent they are based on post-2011 evidence or the false representation that Rockdale argues that SWEPI always knew that the Fitch Well was not viable.

evaluation of the pre-2012 evidence.  Bradford also does not explain how a reasonable factfinder could conclude that SWEPI engaged in gross negligence or willful misconduct by singling only the co-owned Fitch Well, in light of the fact that eight of the nine co-owned wells were put into production.  The Court concludes that it is unreasonable to conclude that SWEPI would intentionally choose to forego 80% of profits ($30,000,000, by Bradford's estimate) from a producing Well, in order to deprive Bradford of its 20% share.  Rossi v. Standard Roofing, Inc., 156 F.3d 452, 466 (3d Cir. 1998) ("If the plaintiff's theory is economically senseless, no reasonable jury could find in its favor, and summary judgment should be granted").

Bradford's evidence does not establish a question of fact as to whether the pre-2012 data available to SWEPI demonstrated that putting the Fitch Well into production would result in substantial profits to both SWEPI and Bradford.  Reasonable operators could disagree about whether the data supported SWEPI's decision, but in no event could an operator reviewing the pre-2012 data conclude that putting the Well into production would result in substantial profits. Accordingly, the Court finds the evidence free from doubt and that no reasonable factfinder could conclude that SWEPI's conduct constitutes gross negligence.  Albright, 696 A.2d at 1164. Additionally, the Court finds that the evidence could not possibly support a finding that SWEPI engaged in willful misconduct.  Paramount Fin. Communications, 2019 WL 3022346, at *12.  In conclusion, there is no genuine issue of material fact that SWEPI's conduct was grossly negligent or that SWEPI engaged in willful misconduct.  Bradford's evidence that SWEPI's decision may have been unwise or negligent is not sufficient for a reasonable factfinder to conclude that SWEPI's decision was the result of gross negligence or willful misconduct.  IP Petroleum Company, 116 S.W.3d at 898 (operator's decision not to complete a well, while perhaps legally sufficient evidence of negligence, did not constitute gross negligence).  The

Court finds that SWEPI's decision not to put the Fitch Well into production falls within the Operating Agreement's exculpatory clause.  Accordingly, Rockdale's Motion for Summary Judgment will be granted because neither SWEPI, nor Rockdale, can be liable because of the exculpatory clause.

   **C.  SWEPI's Motion for Summary Judgment**

   During oral argument the Court questioned the strength of SWEPI's argument that it should be dismissed from this lawsuit because Rockdale had assumed SWEPI's liabilities.  The Court remains of the opinion that had the claims survived Rockdale's Motion for Summary Judgment, SWEPI's Motion would be denied and SWEPI would remain as a party.  The Court need not analyze SWEPI's argument in light of the conclusions that the breach of contract claim asserted against SWEPI was not timely filed.  Further, in addition to its dismissal by virtue of the statute of limitations SWEPI is also protected from liability pursuant to the Operating Agreement's exculpatory clause.  Accordingly, SWEPI's Motion for Summary Judgment will be dismissed, without prejudice, as moot.

**IV.    CONCLUSION**

   Summary judgment as a matter of law will be granted in favor of Defendants Rockdale Marcellus, LLC and SWEPI LP and against Plaintiff Bradford Energy Capital, LLC, and Bradford Drilling Associates XXVII L.P. as to all claims.

   An appropriate order will be entered.

Dated: September 25, 2020

_____
Marilyn J. Horan
United States District Court Judge

37